| | | |
|---|---|---|
| GLORIA KANCHEFF, | § | |
| | § | |
| *Plaintiff,* | § | CIVIL ACTION NO. 2:22-CV-45 |
| | § | |
| v. | § | |
| | § | |
| LIBERTY MUTUAL INSURANCE COMPANY, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

### PARTIES

1.     Plaintiff, Gloria Kancheff, is an individual and a citizen of the State of Texas.

2.     Defendant, Liberty Mutual Insurance Company, is a corporation that is incorporated under the laws of the State of Massachusetts.  Defendant has its principal place of business in the state of Massachusetts.  Defendant may be served with process by serving its registered agent, Corporation Service Company, 211 East 7th Street, Suite 620, Austin, Texas 78701-3218.

### JURISDICTION

3.     The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because plaintiff and defendant are citizens of different U.S. states, and the amount in controversy exceeds $75,000, excluding interest and costs.

### VENUE

4.     Venue is proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district.

### CONDITIONS PRECEDENT

5.  All conditions precedent has been performed or have occurred.

<strong>FACTS</strong>

6.  Plaintiff is the owner of homeowner insurance policy number H3729166669740, which was issued by Liberty Mutual (hereinafter referred to as the "policy").

7.  Plaintiff owns the insured property that is specifically located at 1260 Rosita Valley Road, Eagle Pass, Texas 78852 (hereinafter referred to as the "property").

8.  Defendant or its agent sold the policy insuring the property to plaintiff.

9.  On or about February 16, 2021, plaintiff's property sustained winter storm damage. Plaintiff submitted a claim to Liberty Mutual against the policy for the damage.

10. Plaintiff submitted a claim to Liberty Mutual against the policy for damage caused to the property because of the storm. The insured asked Liberty Mutual to cover the cost of repairs to the property pursuant to the policy and any other available coverages under the policy. Liberty Mutual assigned claim number 044878523-01 to the insured's claim.

11. On February 28, 2021, Liberty Mutual inspected the property in question. The storm caused significant damage to the ceilings, walls, and flooring of the bathrooms, living room, kitchen, hallways, and bedrooms. The extensive damage to the interior of the property called for the flooring to be replaced, drywalls to be sealed, hung, taped, and floated, removal and replacement of insulation, repair to the texture, painting, and contents removal. In addition, the storm damaged the washer, sofa, loveseat, coffee table, and printer. As a result of Liberty Mutual's unreasonable investigation, the insured was wrongly denied the full cost to repair all the interior damage.

12. Liberty Mutual failed to document the damage to the interior. Liberty Mutual conducted an insufficient inspection and prematurely closed the insureds' claim. At the time of the

investigation, premature closing of claims was part of a pattern and practice of claims handling by Liberty Mutual.

13. Liberty Mutual failed to properly adjust the claim and Liberty Mutual has denied at least a portion of the claim without an adequate investigation, even though the policy provided coverage for losses such as those suffered by the insureds. Furthermore, Liberty Mutual underpaid portions of the insureds' claims by not providing full coverage for the damages sustained by the insureds, as well as under-scoping the damages during its investigation.

14. Liberty Mutual failed to properly qualify, train, and supervise its employees and agents to whom Liberty Mutual entrusted the handling of various portions of insureds' claim. Liberty Mutual, its agents, and employees failed to follow procedures and properly execute their duties as promulgated in Liberty Mutual's system of administering and handling the insureds' claim. Liberty Mutual's actions, as detailed in the facts of this complaint and the allegations set forth below, caused a system failure that resulted in Liberty Mutual's violation of the Texas Insurance Code, Texas Deceptive Trade Practices Act, as well as the violation of a host of Texas common law principles. These violations resulted in Liberty Mutual's denial to the insureds of the full protection and benefits of these laws and the policy benefits to which the insureds were entitled.

15. To date, Liberty Mutual continues to delay in the payment for the damages to the property. As such, the insureds' claim(s) remain unpaid, and the insureds still have not been able to properly repair the property.

### LIBERTY MUTUAL'S USE OF LITIGATION

16. "When an insured buys insurance, she buys insurance – not a lot of vexatious, time-consuming, expensive litigation with her insurer." Insurance companies account for future claim payouts, claim expenses, and a reasonable profit in setting premium rates for their books of

business.  However, insurance companies, and Liberty Mutual specifically, have hired consulting companies, such as McKinsey & Company, to implement plans, strategies, policies, and processes to transform insurance companies' claim departments into profit centers.  McKinsey & Company is the most powerful consulting company in the world and has "the greatest global reach of any advisor to management in the world."  It serves as the chief advisor and key architect of strategic thinking for "147 of the world's 200 largest corporations, including 80 of the top 120 financial-services firms, 9 of the 11 largest chemical companies, and 15 of the 22 biggest health-care and pharmaceutical concerns."  McKinsey's clients pay from $10 million to $60 million per year for advice on how to manage their business operations to increase profitability.  McKinsey & Company acted as a leader in formulating a new insurance strategy to convert insurance claim departments into efficient profit centers.  Many of the world's largest insurers hired McKinsey for this purpose.  However, although every insurance company did not hire McKinsey directly and did not have a direct relationship with McKinsey, McKinsey's policies influenced the operations of the insurance industry as a whole because of the extraordinary results McKinsey achieved for the insurance companies that did retain McKinsey directly for its consulting services.  McKinsey has already worked on a number of projects for insurance companies seeking to increase profits.  These include State Farm, Hartford, United Services Automobile Association (USAA), and possibly Nationwide, and Allstate as well.  During the mid-1980's, USAA invited interested members of the insurance community to its home office in San Antonio for open discussions about McKinsey's redesign of its claim system.  USAA credited McKinsey with "saving" the company and openly shared information about McKinsey's creation of USAA's new claims handling system.

17. In essence, the McKinsey strategy calls for Liberty Mutual to take measures to reach various goals as part of its design to convert the insurance claims handling department into an efficient profit center. A major goal of this strategy is to shift any advantage away from the insureds and plaintiffs' attorneys. As the first step in the process, insurers reduce attorney representation levels by improving the initial customer service experience for its insureds. Specifically, insurers make early contact with the insureds following a claim, promise fair treatment, and promise prompt payment. During the claim investigation, insurers aggressively investigate only the facts which defeat the claim once attorney representation begins. Insurers then make "firm" [take-it-or-leave-it] settlement offers with no real negotiation. If the insured refuses to accept the "firm" offer, then the insurance company aggressively litigates the claim to verdict without negotiation or compromise, employing hard-nosed tactics designed to make litigation so lengthy and expensive that policyholders and attorneys will yield to the insurer's claim values. Essentially, policyholders who want "prompt" payment – meaning they are willing to give the insurance company a cut from their share of the claim trust fund – get "Good Hands" treatment; while policyholders who want "fair" payment – meaning they refuse to give the insurance company a cut from their share of the claim trust fund – get "Boxing Gloves" treatment. No policyholder, however, will get both prompt *and* fair payment of a claim.

18. Liberty Mutual implemented a litigation management system designed to enforce plaintiffs' acceptance of its new claim system. Under traditional casualty insurance thinking, insurers were naturally disposed to avoiding litigation whenever possible, because litigation tended to defeat the goals of the fiduciary/indemnity paradigm. Liberty Mutual sees litigation as providing the best possible venue for achieving the goals of its new system for casualty insurance. Litigation is costly and time consuming. It allows an insurer to fully exploit its overwhelming

financial superiority and the policyholder's vulnerability to delay, which is the natural consequence of the casualty loss. Litigation also provides a means for Liberty Mutual to send messages to other policyholders and plaintiffs' attorneys about the futility of resistance to the new system.

19. In addition to these company-level procedures, Liberty Mutual implemented an insurance company strategy that focuses on societal, legislative, and commercial measures which all but ensures the success of the strategy. Liberty Mutual implemented a plan for insurance companies to lead national campaigns to attempt to change public policy, abolish or reduce the effectiveness of bad faith statutes, and judicially repeal the common law fiduciary/indemnity paradigm which made it bad faith for casualty insurers to use increased shareholder value or increased claim surpluses as the only legitimate goals of claim handling.

20. Defendant's claim handling protocols, company goals, profit goals, and claim handling strategy originate from the doctrine that was created, implemented, and shared with the insurance community by McKinsey. Defendant's protocols, strategies, and procedures for handling homeowner insurance claims are closely aligned with and virtually match the claims handling system created by McKinsey. In the case at hand, Liberty Mutual implemented McKinsey's claim handling system to increase its profits at plaintiff's expense, and these actions caused Liberty Mutual to wrongly deny plaintiff's claim.

## INFORMATION LIKELY TO BE IN THE POSSESSION OF LIBERTY MUTUAL

21. As with all bad faith cases, most of the proof of plaintiff's bad faith claim against Liberty Mutual will be uniquely and solely in Liberty Mutual's possession. Therefore, because the facts pled in this complaint are peculiarly within the defendant's knowledge, the facts contained in plaintiff's complaint are based on plaintiff's available information and belief. FED. R. CIV. P. 9(b).

Such allegations have evidentiary support arising out of the facts of this case, and the plaintiff believes such allegations will have further evidentiary support after a reasonable opportunity for further discovery from Liberty Mutual.

22. Liberty Mutual initiated a claims handling program with the assistance of McKinsey and Company. The purpose of the Liberty Mutual's McKinsey program was nothing less than to transform Liberty Mutual into the most profitable claim service in the industry. Liberty Mutual achieved this goal by artificially reducing claim payments. Liberty Mutual also conducted a closed file survey using its own personnel rather than independent auditors. These closed file surveys purported to identify which claims were overpaid. The closed file survey included a flaw as it did not utilize an established metric for the underpayment of claims. The true motive behind the closed file survey was to identify ways to artificially lower claim payouts in a manner detrimental to Liberty Mutual's first- and third-party claimants. In the case at hand, Liberty Mutual employed its McKinsey claims handling program in its handling of plaintiff's claim in a manner that maximized shareholder profits and compromised the fair handling of plaintiff's claim.

23. Liberty Mutual ensured its employees would assist in the implementation of the McKinsey program by creating incentive programs for claim adjusters and management to reduce average claim payouts, regardless of merit. These artificial goals had, and continue to have, no rational relationship to the actual value of any individual claim, including the plaintiff's claim in this case.

24. One of the ways in which Liberty Mutual achieved lowered claim payments was to adopt an aggressive strategy towards water claims. Following water claims, Liberty Mutual implements a policy of standard denial, which requires insurance adjusters to initially deny policyholder claims as a means of gauging the policyholder's willingness to haggle with the insurance company. If

the policyholder accepts the denial, then Liberty Mutual retains all the money owed to the policyholder. In essence, Liberty Mutual eliminates claims by issuing sweeping denials under the presumption that some policyholders will accept the denial without question. Policyholders who refuse to accept the denial and choose to pursue their claim through litigation, however, face "mad dog defense tactics" that frustrate policyholders' ability to pursue their claims. In addition, because litigating insurance bad faith claims has become so expensive and time consuming, policyholders and attorneys are becoming increasingly unwilling to fight insurance companies. Thus, Liberty Mutual not only frustrates policyholders' attempts to pursue their claim, but Liberty Mutual also sends a message to plaintiffs' attorneys that filing suit against Liberty Mutual does not constitute an economically viable option. As a result, lawyers who routinely represent plaintiffs in first-party insurance homeowner insurance claims will refuse to represent plaintiffs who have claims against Liberty Mutual.

25. Liberty Mutual also routinely withholds "overhead and profit" as part of its scheme to achieve lowered claim payments. "Overhead and profit" is a benefit available to policyholders that provides an additional twenty percent above the amount of the claim to pay for a general contractor to coordinate repairs. Insurance companies have an obligation to include overhead and profit in the actual cash value payment. Liberty Mutual conceals and fails to disclose the availability of the overhead and profit benefit to policyholders. In this case, Liberty Mutual wrongfully denied coverage for plaintiff's claim for overhead and profit.

26. Liberty Mutual also creates an environment that encourages independent adjusters to underpay claims. By tracking the average amount paid on claims for each adjuster, Liberty Mutual can determine which adjusters are keeping costs down. Liberty Mutual therefore rewards independent adjusters by giving them additional business in exchange for minimizing Liberty

Mutual's indemnity payout on claims. This arrangement creates a conflict of interest between the independent adjusters and the policyholders and allows the policyholders to detrimentally rely on the independent adjusters' determinations without knowledge of the conflict of interest. In this case, Liberty Mutual assigned an inadequately trained adjuster to inspect plaintiff's property and adjust plaintiff's claim. In addition, the adjuster had a Liberty Mutual-provided financial incentive to deny all or part of plaintiff's claim.

27. Through implementation of its McKinsey program, Liberty Mutual develops incentives, such as promotions for keeping costs down, that results in policyholders being paid less than they are owed. The McKinsey program creates pressure for profit-making that manifests itself in underpayment of claims. Liberty Mutual had actual awareness that its McKinsey program would result in underpaying plaintiff's claim. Liberty Mutual employs a nationwide scheme to cheat policyholders out of money to which the policyholders are entitled. Liberty Mutual has employed the principles and techniques of the McKinsey program against plaintiff in this case in a deceptive, fraudulent, oppressive, and malicious manner. In this case, Liberty Mutual provided its managers, adjusters, and employees who handled plaintiff's claim with a financial incentive to deny all or part of plaintiff's claim.

28. Another component of the McKinsey program focused on the rate at which claimants were represented by legal counsel. Liberty Mutual's McKinsey program manual directed claim representatives to "realize that the way we approach claimants and develop relationships will significantly alter representation rates and contribute to lower severities." The manual explained that "payment on represented claims is on average five times the size of unrepresented claims." Consequently, Liberty Mutual instructed its claim personnel to eliminate or reduce the likelihood that a claimant would hire an attorney.

29.    By dissuading claimants from seeking legal counsel, Liberty Mutual was able to prey upon unrepresented claimants' trust and lack of knowledge and to deny or settle claims for a fraction of their value.  If a settlement offer was not accepted or the claimant hired an attorney, Liberty Mutual would fully litigate virtually every claim, irrespective of the value of the injuries suffered by the claimant.  Liberty Mutual thereby sought to subject claimants to unnecessary and oppressive litigation and expenses, or in other words, "scorched-earth litigation tactics."  In the case at hand, Liberty Mutual wrongfully denied all or a portion of plaintiff's claim with the expectation that plaintiff would not hire an attorney.

30.    Liberty Mutual instructed its claim representatives to meet with the claimants' attorneys to emphasize those costs" *i.e.*, "attorney economics" – through threats, intimidation, and strong-arm tactics.  Liberty Mutual carried out its policies through the active participation of its attorneys.  The "Litigation Management" section of the McKinsey program manual segmented, or targeted, certain claims for litigation and trial.  One such litigation segment was referred to as "Settle for 'X' or less – default to trial."  Liberty Mutual's attorneys were required to "increase trial activity in appropriate cases," such as "where settlement could not be reached for the evaluated amount."  The reason that Liberty Mutual's attorneys were expected to have "more trials" was to "reduce loss payout."  Liberty Mutual used incentive compensation programs to encourage its attorneys to try more cases, irrespective of whether such litigation was justified by the facts.  In the case at hand, Liberty Mutual denied plaintiff's claim as part of its scheme to use litigation costs and "attorney economics" to dissuade plaintiff and any attorney plaintiff would hire from challenging Liberty Mutual's claim decision.

31.    Any resulting decrease in claim payments did not serve as a reflection of the true value of the defended claims.  Liberty Mutual's research indicated that claimants' attorneys who brought

cases to trial obtained favorable results. Liberty Mutual determined, expressly and as a matter of corporate claims handling policy, that litigating claims "appear to lead to better results than negotiating with plaintiff attorneys." Nevertheless, because of Liberty Mutual's scorched-earth litigation tactics and the message Liberty Mutual sends to attorneys regarding Liberty Mutual's proactive claim defense stance, Liberty Mutual correctly predicted that substantially fewer claimant attorneys would bring those insureds' claims to trial. Hence, Liberty Mutual would receive a net decrease in claim payouts.

32. Liberty Mutual applied the claim handling principles of its McKinsey claims handling program across all insurance coverage lines. Specifically, Liberty Mutual specifically implemented a version of the McKinsey program to govern its handling of homeowner insurance claims.

33. Liberty Mutual handled plaintiff's claim under the construct, policies, procedures, and goals of the McKinsey program created by McKinsey & Company and implemented by Liberty Mutual.

**LIBERTY MUTUAL'S CLOSED FILE SURVEY**

34. Prior to Liberty Mutual's implementation of its homeowner version of the McKinsey program, McKinsey & Company conducted a preliminary "Closed File Survey" of eleven (11) Market Claims Offices ("MCO's"). Before initiating the survey, McKinsey began with the presumption that Liberty Mutual's claim process exhibited "leakage," or the overpayment of policyholder claims. It is worth noting that the McKinsey's research provided no proof or support for this critical assumption. Subsequently, Liberty Mutual's senior executives became somewhat uncomfortable with McKinsey's term "leakage," and began to substitute the oxymoronic phrase "fair value" or "fair payment."

35.     McKinsey then segmented claims into homogenous groups based on type of coverage, type of damage, and attorney involvement.  Using this segmentation procedure to organize the claim processes that would make up the homeowner portion of the McKinsey program, McKinsey classified claims into groups based on common characteristics, which presented the best opportunity for reducing claim payments.  McKinsey determined that the evaluation of water claims presented the largest opportunity for reduced claim payouts.  McKinsey's closed file survey indicated that "overpayments" occurred in the adjustment of claims when adjusters evaluated claims based on their professional claim experience according to the individual merits of each claim.

36.     The Liberty Mutual McKinsey documents are the construction plan for Liberty Mutual's "claim payment factory."  They show how McKinsey designed Liberty Mutual's claim handling system to underpay homeowner and other insurance claims.  They show how McKinsey designed Liberty Mutual's claim factory to produce an inherently defective product that fails to provide insureds with prompt and fair indemnification for their covered losses, thereby endangering our standard of living.  Liberty Mutual evaluated the plaintiff's claim using this system and denied the plaintiff's claim for reasons unrelated to the merits of the claim.

37.     Liberty Mutual knew that its implementation of the McKinsey program would create a significant risk of liability for bad faith claims and punitive damages.  Nevertheless, Liberty Mutual analyzed the McKinsey program for "balance of risk and reward" and concluded that the McKinsey program's rewards would justify any risk.  In other words, even if Courts and juries imposed bad faith penalties on the minimal amount of cases that proceeded to trial, the McKinsey program would still produce the intended profits because plaintiffs' lawyers would overall be reluctant to litigate and take enough cases to trial.  Remember, Liberty Mutual devoted a

substantial portion of the McKinsey program to sending a message to plaintiffs' attorneys regarding "attorney economics" and the fact that Liberty Mutual would vigorously defend claims without regard to the merits of those claims.

38.     The goals, processes, and procedures of the McKinsey program have been absorbed into Liberty Mutual's overall way of doing business.   Liberty Mutual never stopped using the McKinsey program in its handling of insurance claims.   Liberty Mutual never hired McKinsey or another consulting firm to take on the monumental task of teaching a different claims handling system to its employees, instilling a new claim handling culture, or ensuring the elimination of the McKinsey program from Liberty Mutual's claim handling culture, goals, and procedures.   The goals, processes, and procedures left over from the McKinsey program have been used to deny the plaintiff's claim in a deceptive, fraudulent, oppressive, and malicious manner.   In the case at hand, Liberty Mutual employed its McKinsey-based claim system in its handling of plaintiff's claim.   In doing so, Liberty Mutual denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns.   To date, Liberty Mutual continues to delay in the payment for the damages to the property.   As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

## POST-CLAIM UNDERWRITING

39.     Plaintiff alleges that Liberty Mutual engaged in fraudulent post-claim underwriting.   At the time that defendant sold the insurance policy to plaintiff, defendant had no intention of performing its duties and honoring the representations it made to plaintiff.   Specially, this representation consisted of defendant's promise to provide full indemnity to plaintiff from financial loss caused by a covered peril, less the policy deductible.   Liberty Mutual intentionally

under-evaluated the risk associated with the insurance policy in an effort to secure the policy sale and made an attempt to properly evaluate the risk only after plaintiff filed the insurance claim at issue. In its use of post-claim underwriting, defendant searched for reasons to deny plaintiff's claim by conducting the type of evaluation that it should have conducted before defendant sold the policy to plaintiff and before plaintiff paid insurance premiums to defendant. Had plaintiff known and understood that defendant would engage in post-claim underwriting before plaintiff agreed to purchase the insurance policy from defendant, the plaintiff could have made an informed decision and purchased coverage from a different insurance company. Defendant's actions allowed defendant to collect an upfront premium profit while intending to betray its promise of full indemnity. In the case at hand, defendant's fraudulent post-claim underwriting scheme caused plaintiff to purchase a worthless insurance policy and suffer financial property loss.

40. Liberty Mutual denied or underpaid plaintiff's claim as part of a strategy and scheme to guarantee or increase its surplus and shareholder returns. To date, Liberty Mutual continues to delay in the payment for the damages to the property. As such, the plaintiff's claim remains unpaid, and the plaintiff was never able to properly repair the property.

## COUNT 1 - BAD FAITH

41. Plaintiff is an insured under an insurance contract issued by Liberty Mutual, which gave rise to a duty of good faith and fair dealing.

42. Defendant breached the duty by denying and delaying payment of a covered claim when defendant knew or should have known its liability under the policy was reasonably clear.

44. Defendant also breached the duty by creating and applying a claim handling system that was designed to ensure that the plaintiff's claim was denied without consideration of the merits of the claim.

43.     Following its initial inspection, Liberty Mutual possessed all information necessary to enable it to make a fair coverage and payment determination on plaintiff's claim.   In addition, following its initial inspection, Liberty Mutual failed to provide coverage for all the covered damage, including the damage that plaintiff's inspector discovered during his inspection. Although Liberty Mutual should have designed its claims investigation system in a manner that would ensure timely claim payments, reasonable property inspections, and thorough property inspections, Liberty Mutual failed to honor its obligation to perform a reasonable investigation and issue timely payment to plaintiff.

44.     Defendant's breach of duty proximately caused injury to plaintiff, which resulted in the following damages:

      a.     mental anguish damages; and

      b.     loss of policy benefits.

45.     <u>Exemplary damages.</u>  Plaintiff suffered injury independent of the loss of policy benefits, and that injury resulted from defendant's gross negligence, malice, or actual fraud, which entitles plaintiff to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

### COUNT 2 - BREACH OF CONTRACT

46.     In addition to other counts, Liberty Mutual breached its contract with plaintiff.

47.     Plaintiff and defendant executed a valid and enforceable insurance contract.  The contract stated that defendant would pay the replacement cost of all damage which occurred to plaintiff's property caused by a covered peril, and that plaintiff would pay insurance premiums and perform other obligations as outlined in the insurance policy.

48.     Plaintiff fully performed plaintiff's contractual obligations.

49.     Liberty Mutual breached the contract by refusing to pay the full amount of the cost to repair or replace the property. Liberty Mutual failed and refused to pay any of the proceeds of the policy, although due demand was made for proceeds to be paid in an amount sufficient to cover the damaged property and all conditions precedent to recovery upon the policy had been carried out and accomplished by plaintiff.

50.     Plaintiff seeks unliquidated damages within the jurisdictional limits of this court.

51.     <u>Attorney Fees.</u>  Plaintiff is entitled to recover reasonable attorney fees under Texas Civil Practice & Remedies Code chapter 38 because this suit is for breach of a written contract. Plaintiff retained counsel, who presented plaintiff's claim to Liberty Mutual. Liberty Mutual did not tender the amount owed within 30 days of when the claim was presented.

## COUNT 3 – DECEPTIVE INSURANCE PRACTICES

52.     Defendant Liberty Mutual failed to explain to plaintiff the reasons for Liberty Mutual's offer of an inadequate settlement. Liberty Mutual failed to offer plaintiff adequate compensation without adequate explanation of the basis in the policy for its decision to make less than full payment. Furthermore, Liberty Mutual did not communicate that any future settlements or payments would be forthcoming to pay for the entire losses covered under the policy, nor did they provide any explanation for the failure to adequately settle plaintiff's claim.

53.     Liberty Mutual failed to affirm or deny coverage of plaintiff's claim within a reasonable time. Specifically, plaintiff did not receive timely indication of acceptance or rejection, regarding the full and entire claim, in writing from Liberty Mutual.

54.     Liberty Mutual refused to fully compensate plaintiff under the terms of the policy, even though Liberty Mutual failed to conduct a reasonable investigation. Liberty Mutual performed an

outcome-oriented investigation of the plaintiff's claim which resulted in a biased, unfair, and inadequate evaluation of plaintiff's losses on the property.

55. Liberty Mutual failed to meet its obligations under the Texas Insurance Code regarding its duties to timely acknowledge plaintiff's claim, begin an investigation of plaintiff's claim, and request all information reasonably necessary to investigate plaintiff's claim within the statutorily mandated time of receiving notice of plaintiff's claim.

56. Liberty Mutual failed to accept or deny plaintiff's full and entire claim within the statutorily mandated time of receiving all necessary information. In addition, Liberty Mutual failed to communicate with plaintiff to ensure that plaintiff understood the coverage denials they received.

57. Defendant's acts or practices violated:

a. Texas Insurance Code chapter 541, subchapter B.

(1) Misrepresenting to a claimant a material fact or policy provision relating to the coverage at issue. TEX. INS. CODE §541.060(a)(1).

(2) Not attempting in good faith to bring about a prompt, fair, and equitable settlement of a claim once the insurer's liability becomes reasonably clear. TEX. INS. CODE §541.060(a)(2)(A).

(3) Not promptly giving a policyholder a reasonable explanation, based on the policy as it relates to the facts or applicable law, for the insurer's denial of a claim or for the offer of a compromise settlement of a claim. TEX. INS. CODE §541.060(a)(3).

(4) Not affirming or denying coverage within a reasonable time. TEX. INS. CODE §541.060(a)(4)(A).

(5)     Refusing to pay a claim without conducting a reasonable investigation. Tex. Ins. Code §541.060(a)(7).

(6)     Making an untrue statement of material fact. Tex. Ins. Code §541.061(1).

(7)     Leaving out a material fact, so that other statements are rendered misleading. Tex. Ins. Code §541.061(2).

b.     Texas Deceptive Trade Practices Act §17.46(b).

(1)     Representing that an agreement confers or involves rights, remedies, or obligations that it does not, or that are prohibited by law. Tex. Bus. & Com. Code §17.46(b)(12).

c.     Texas Insurance Code Chapter 541.151.

58.     Defendants' acts and practices were a producing cause of injury to plaintiff which resulted in the following damages:

a.     actual damages; and

b.     insurance policy proceeds.

59.     Plaintiff seeks damages within the jurisdictional limits of this Court.

60.     <u>Additional damages.</u>  Defendants acted knowingly, which entitles plaintiff to recover treble damages under Texas Insurance Code section 541.152(b).

61.     <u>Attorney fees.</u>  Plaintiff is entitled to recover reasonable and necessary attorney fees under Texas Insurance Code section 541.152(a)(1).

### COUNT 4 - LATE PAYMENT OF CLAIMS

62.     Plaintiff is an insured under a contract for homeowner's insurance issued by defendant.

63.     Defendant Liberty Mutual is a corporation.

64.     Plaintiff suffered a loss covered by the policy and gave proper notice to Liberty Mutual of plaintiff's claim.

65.     Liberty Mutual is liable for the claim and had a duty to pay the claim in a timely manner.

66.     Defendant breached its duty to pay plaintiff's claim in a timely manner by not timely:

    a.     acknowledging the claim;

    b.     investigating the claim;

    c.     requesting information about the claim;

    d.     paying the claim after wrongfully rejecting it; and

    e.     paying the claim after accepting it.

67.     Liberty Mutual's breach of duty caused injury to plaintiff, which resulted in the following damages:

    a.     mental anguish damages;

    b.     policy proceeds;

    c.     prejudgment interest

68.     <u>Statutory damages.</u>   Plaintiff is entitled to recover actual damages in the amount of the claim, and under Texas Insurance Code section 542.060(a), statutory damages of 18% of the amount of the claim.

69.     <u>Attorney fees.</u>   Plaintiff is entitled to recover reasonable attorney fees under Texas Insurance Code section 542.060(b).

### COUNT 5 – COMMON LAW FRAUD

70.     Underwriting is not only a part of insurance; underwriting *is* insurance.  Underwriting is the function of securing and evaluating information and making decisions to accept or reject risks.  The insurance underwriting and claims processes are inextricably linked.  When a loss occurs, the

policyholder's payment of that loss has already been collected during the underwriting process. Insurance can work effectively only if underwriters accept risks that will experience no more than the types and amounts of losses anticipated in rates. If the underwriters accept risks that experience more losses than anticipated, the rates will be inadequate, and the insurer's solvency might be threatened.

71.  Before an insurer sells an insurance policy to a customer, the insurance company underwrites the property to be insured. When an insurer underwrites a new policy, it records a premium receivable (which is an asset) and a claim obligation (which is a liability). Hence, the claim handling process begins when the insurance company sells the insurance policy to the insureds – not when the anticipated loss occurs. The liability is considered part of the unpaid losses account, which represents the loss reserve. Maintaining an adequate level of loss reserves puts an insurance company in a better financial position to pay out claims.

72.  Thus, the insurer reserves money to pay a claim in advance of the claim occurrence and during the policy underwriting process. Specifically, in calculating the premium, the insurance company performs a set of calculations. First, the insurance company determines the "loss costs.", which make up the primary block of the insurance premium. Loss costs are the insurer's good faith projection of how much it will pay for claims that arise under the policy during a given policy period. Loss costs are based on vast actuarial experience and are usually very accurate, being based on the "law of large numbers." Generally, loss costs make up generally about seventy cents ($0.70) of every premium dollar an insured pays for property-casualty coverages.

73.  To correctly underwrite any risk and thus properly calculate the loss costs, the insurance company underwriters must secure information about the risk. Every discussion about the underwriting decision to be made on an insurance application must be based on facts that have

been secured. One of the major reasons for securing information about each risk concerns the insurance company's avoidance of adverse selection in underwriting a policy. Adverse selection refers to situations in which an insurance company extends coverage to an applicant whose actual risk is substantially higher than the risk known by the insurance company. To minimize the risk of adverse selection, the insurance company must obtain information regarding the physical condition of the buildings it contemplates insuring. Thus, property inspections are critical in the underwriting workflow. These inspections are often used to verify the insureds not only exists at the address on the policy and there are no liability or other hazards that exist on the property that could cause the property owner and/or the insurance company unnecessary exposure. These inspections are used as an underwriting tool to minimize the potential of an insurance claim and to verify that the information collected at the time of application for the policy is correct. Liberty Mutual failed to conduct an underwriting inspection and failed to property underwrite the insurance policy.

74. Liberty Mutual could not provide its insurance services unless it was able to make a legitimate profit sufficient to allow it to remain solvent and provide a reasonable return to its shareholders. The premium that Liberty Mutual required plaintiff to pay for the insurance policy was calculated to allow Liberty Mutual to accomplish those goals.

75. Liberty Mutual charges its policyholders about seventy cents ($0.70) out of every premium dollar to pay all the claims that will arise during the policy period. Expenses and overhead account for an additional twenty-five cents ($0.25) of each premium dollar, with the remaining five cents ($0.05) being allocated for Liberty Mutual's profit. In addition, Liberty Mutual's profits include not only the final five cents ($0.05) of the premium dollar but also the investment value on the entire premium dollar during the time between when the premiums are

collected and when the claims are finally paid (on average about ten cents ($0.10) per dollar) making the real profit about fifteen cents ($0.15) for each premium dollar.

76. Liberty Mutual made the material representation to plaintiff that Liberty Mutual would pay the full cost of casualty losses, less the policy deductible, that plaintiff suffered in a covered event. This representation was false. When Liberty Mutual made this representation, Liberty Mutual knew that Liberty Mutual had not underwritten the policy correctly. The McKinsey program dictated that Liberty Mutual focus on marketing, collecting premiums, and building a litigation program to vigorously fight policyholders who attempted to challenge Liberty Mutual's claim decisions. Liberty Mutual did not underwrite the policy with the intent of paying the full value of future claims. Just the opposite – Liberty Mutual underwrote the policy knowing that the McKinsey claim handling system would enable it to enforce its predetermined claim values without regard to the true value of a policyholder claim. In other words, because Liberty Mutual's McKinsey program predetermined policyholder claim values, it was unnecessary for Liberty Mutual's actuaries to predict the value of future claims through the underwriting process.

77. When Liberty Mutual sold plaintiff the insurance policy, Liberty Mutual promised to pay the full value of future covered claims. Liberty Mutual knew that it had no intention of paying the full value of policyholder claims, and that Liberty Mutual would only pay the predetermined claim value calculated via the McKinsey method without regard to the actual value of the sustained loss. Liberty Mutual knew that, if plaintiff challenged the claim decision, Liberty Mutual would implement its litigation plan to force plaintiff to accept Liberty Mutual's predetermined claim value. Liberty Mutual made this representation with the intent that the plaintiff act on it. Liberty Mutual knew that the plaintiff was seeking peace of mind, and Liberty Mutual made the representation knowing that plaintiff would act on it. The plaintiff purchased the policy, paid all

premiums, in reliance on the representation and with the expectation that Liberty Mutual would keep its promise. The representation caused injury to plaintiff.

78. The McKinsey program dictated that Liberty Mutual give plaintiff a choice: Accept a settlement now for a fraction of the true cost of plaintiff's damage or expect to spend several years in grueling litigation. McKinsey predicted that ninety percent (90%) of claimants would be forced to capitulate because the claimants would need the money in a prompt settlement. The plaintiff gave Liberty Mutual money for something that the plaintiff could never receive. Liberty Mutual sold uncollectible insurance to the plaintiff. With one hand, Liberty Mutual sold the plaintiff an insurance policy and promised to protect the plaintiff from financial harm. With the other hand, Liberty Mutual used the McKinsey program as a hammer to destroy the protection that Liberty Mutual promised to provide.

79. Liberty Mutual lied when it informed plaintiff that the policy did not cover all of plaintiff's damages. Liberty Mutual's motivation in telling this lie was to properly execute the McKinsey strategy and thus allocate the entire policy premium to profit. Liberty Mutual told this lie to further the original fraud – the selling of an insurance policy to plaintiff that Liberty Mutual knew would not function as promised.

80. Liberty Mutual's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

      a. actual damages;

      b. exemplary damages; and

      c. prejudgment interest.

## COUNT 6 – FRAUD BY NONDISCLOSURE

81.    Plaintiff incorporates into this count the allegations contained in paragraphs 70 through 80.  The McKinsey program would govern any claim filed by plaintiff under the policy.  As previously described, the purpose of the McKinsey program was to increase corporate profits at plaintiff's expense should plaintiff ever file a claim under the policy.  Liberty Mutual concealed this fact from plaintiff and failed to disclose the facts about the McKinsey program to plaintiff.  Because the operation of the McKinsey program directly contradicted the promises that Liberty Mutual made to the plaintiff, Liberty Mutual had a duty to disclose these material facts to plaintiff.  The defendant knew the plaintiff was ignorant of the facts and that the plaintiff did not have an equal opportunity to discover the facts.  Liberty Mutual was deliberately silent when it had a duty to speak.  By failing to disclose the facts, the defendant intended to induce the plaintiff to purchase the insurance policy.  Plaintiff purchased the policy and thus relied on Liberty Mutual's nondisclosure.  Plaintiff was injured when plaintiff acted without the knowledge of the undisclosed facts.

82.    Liberty Mutual's fraudulent actions caused injury to plaintiff, which resulted in the following damages:

       a.    actual damages;

       b.    exemplary damages; and

       c.    prejudgment interest.

### THE WHO, WHAT, WHEN, AND WHERE

83.    In support of the elements of common law fraud and fraudulent nondisclosure, plaintiff alleges the following:

       a.    **THE WHO:**    David Long and Mark C. Touhey

b. **THE WHAT:** First misrepresentation – Long and Touhey represented that Liberty Mutual would pay the full cost of all covered losses, less the policy's deductible. Long and Touhey made this representation in writing in the insurance policy that Liberty Mutual sold plaintiff.

c. **THE WHEN:** April 18, 2020

d. **THE WHERE:** Eagle Pass, Texas

## JURY DEMAND

84. Plaintiff respectfully requests a trial by jury.

## CONDITIONS PRECEDENT

85. All conditions precedent to plaintiff's claim for relief have been performed or have occurred.

## PRAYER

86. For these reasons, plaintiff asks that plaintiff be awarded a judgment against defendant for the following:

a. Actual damages.

b. Prejudgment and postjudgment interest.

c. Consequential damages.

d. Court costs.

e. Attorneys' fees.

f. Exemplary damages.

g. All other relief to which plaintiff is entitled.

Respectfully submitted,

GULF COAST INSURANCE LAWYERS, P.C.
The Great Jones Building
708 Main Street
Houston, Texas 77002
Telephone: (713) 941-9309
Facsimile: (844) 270-0740

Danny Ray Scott
State Bar No. 24010920
danny@gulfcoastinsurancelawyers.com

Nohayia Javed
State Bar No. 24074482
THE JAVED LAW FIRM, PLLC
3019 Spider Lily
San Antonio, Texas 78258
Telephone: (832) 360-0476
Facsimile: (281) 605-5020
attorneyjaved@gmail.com

*Attorneys for Plaintiff*